[Crim. No. 13513.   Second Dist., Div. Five.   Sept. 11, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. FLEMING DANIEL GRAY, JR., et al., Defendants and Appellants.

David A. Binder and Meyer S. Levitt for Defendants and Appellants.

A. L. Wirin, Fred Okrand and Laurence R. Sperber as Amici Curiae on behalf of Defendants and Appellants.

Roger Arnebergh, City Attorney, Philip E. Grey, Assistant City Attorney, Richard G. Kolostian and Irwin S. Evans, Deputy City Attorneys, for Plaintiff and Respondent.

KAUS, P. J.—This appeal involves certain problems that arise when a defendant to a criminal charge claims that the prosecution against him is the result of discriminatory

enforcement of the law and therefore a denial of equal protection. (*Yick Wo* v. *Hopkins,* 118 U.S. 356 [30 L.Ed. 220, 6 S.Ct. 1064].)

Both defendants were convicted of violating section 38.03 of the Los Angeles Municipal Code which reads as follows: "No person shall paint, mark or write on or post or otherwise affix or attach any handbill or sign to or upon any building, wall or part thereof, or upon any private property without the consent of the owner, agent or occupant thereof." Proceedings were suspended and each defendant was placed on summary probation for one year on certain conditions. The appeal is from the orders granting probation.

There is no question that defendants committed the acts proscribed by the ordinance. In fact each defendant took the stand and so testified.[1] The only reason given below and asserted here why defendants should not be convicted is that in prosecuting them under the ordinance the People enforced it "with an evil eye and an unequal hand . . ." (*Yick Wo* v. *Hopkins,* 118 U.S. 356, 373-374 [30 L.Ed. 220, 227, 6 S.Ct. 1064].)

In support of this contention defendants introduced substantial evidence. The issue was tried to the jury concurrently with the basic issue of guilt and the court instructed the jury on the nature of the defense. It also allocated and defined the burden of proof. By finding defendants guilty the jury impliedly found that the defense had not been established by the quantum of evidence required by the court's instructions.

### The Facts—People's Case

On the night of June 26, 1966 at about 2 a.m. Officer Reynolds observed defendants Gray and Coleman in the process of posting a sign on a board fence.

The sign consisted of three capital B's arranged vertically one above the other. The first two were followed by three hyphens and a comma, the last by three hyphens and an exclamation point. The entire message was in quotes. One of the defendants said that they were working on a political campaign and that the sign stood for "Bring, Back, Brown!"[2]

---

[1]This was quite helpful to the prosecution, since the evidence against the defendant Coleman was on the weak side.

[2]At the time the incumbent Governor Brown had been nominated at the June primary as the Democratic candidate for Governor in the November election. It is noted that the number of hyphens does not match this explanation, nor another one subsequently given.

The defendants also said that they had no permission from anyone to put up the sign.

Reynolds placed defendants in his black and white police car and proceeded to a call box about two blocks away. After he had run a record check on defendants, which was negative, he got in touch with the supervisor at his station and reported. He was told to release defendants. He took them back to the scene—11th and Sentous, a little way southwest of central Los Angeles—deposited them and left. No superior had ever instructed him to single out violators of section 28.03 who put up signs bearing the ''B---, B---, B---!'' legend. In fact he had never been given any specific instructions about how to enforce that particular section of the Municipal Code.

Later Officer Reynolds reported the incident to his supervisor in writing.

Mr. Northrop, the owner of the property in question, testified that he never gave defendants permission to post that particular sign. He did not complain to the police about the ''B---, B---, B---!'' sign, but a Sergeant Holtz got in touch with him and asked him whether he had given permission to defendants. There was a good deal of fairly inconclusive testimony from Northrop concerning his conversation with the police which either may or may not suggest to a trier of facts that the police would not have prosecuted if Northrop had not objected to the signs, once they were up, in spite of the lack of a prior permission. In connection with this testimony Northrop made the following statement to which defendants attach some importance: ''He didn't tell me definitely 'We are going to prosecute' but that I was—*something was up* and I would hear about it or I wouldn't hear about it.'' (Italics added.)

### FACTS—DEFENDANTS' CASE

Preliminarily we should say defendants' case was a marvel of meticulous and sensitive preparation, geared precisely to the constitutional issues involved. We mention this fact not to pat anyone on the back, but as proof which supports our ultimate conclusion that to put as heavy a burden of proof on defendants as the trial court did in this case, nullifies the availability of the doctrine of *Yick Wo* v. *Hopkins, supra,* as a defense.

First defendants showed many photographs of signs of every nature posted in random locations throughout the City of Los Angeles in connection with the 1966 primary elec-

tions. Then they produced testimony from the owners of the properties involved to the effect that they had never given permission for the signs in question to be posted and that the police had never been in touch with them concerning these signs. Typically the cross-examination of these owners showed that they did not know who put up the signs.

Ellsworth R. Dressman, a professional billposter since 1932, was called by defendants, but just exactly whom his testimony favored is anybody's guess. Construing his many equivocations most strongly in favor of the People it amounts to this: In 1966 he had been ''stopped'' five or six times by the police while posting signs. On each occasion he gave the police his card. Nothing further happened. On each of those occasions he had had permission from the owners in question to put up the signs.[3] He also testified that many times when officers observed him in the act of posting signs on private property, nothing happened.[4]

Benjamin Hite, our registrar of voters, testified to the fact of the 1966 election, the number of candidates and so forth.

Judicial notice was taken that between January 1 and July 31, 1966 the dockets of the Municipal Court of the Los Angeles Judicial District showed only two prosecutions for violations of section 28.03 out of about 25,000 nontraffic misdemeanor complaints. One was the subject litigation, the other charge was against one Carolyn Perkins Sweezy and one Clayborne Carson. Miss Sweezy, who later testified, was also caught in the act of putting up ''B---, B---, B---!'' signs.

Various representatives of printing companies testified to the number of political posters which they printed in connec-

---

[3]The ordinance in question uses the word ''consent'' and not permission. All parties, throughout the trial, considered the two words to be synonymous. Analysis of Mr. Dressman's testimony reveals that his idea of what was consent or permission was very broad indeed. Thus he figured that if at one time in the past he gave a particular owner a pass to an event such as the Date Festival or a picture show, thereby obtaining consent at that particular time, the consent was valid until revoked. He also testified that, on occasion, he would keep the consent alive by sending the owners new passes.

[4]''THE WITNESS: Well, all I want to say is that a lot of times an officer will stop you if he catches you around the building because he doesn't know if you are taking plywood or you're taking cement or something, and he is protecting the other people's property. And when he sees you with a truck there, why, he thinks you are taking something. So naturally he stops you. But usually if an officer sees you right in the act and we have our long-handled brush and we're throwing up paper, he just goes on by and they don't bother you. Now, this happens hundreds of times where they never stop you.''

tion with the 1966 election campaign. Naturally the figure, though never precisely established, was extremely high.

Roger Murdock, deputy chief of police in charge of the patrol bureau, was called by defendants. He testified as follows: Of a total of slightly over fifteen thousand officers employed by the Los Angeles Police Department, 56 percent were assigned to patrol duty. The greatest concentration of officers on duty is during the hours of darkness. Section 28.03 "is a very irritating section. It is very hard to find perpetrators and we get many complaints about it, usually during election time." He was not familiar with a single case where the complaining owner was able to identify the violator. There was no departmental policy with regard to persons who put up "B---, B---, B---!" signs, nor has he ever given any of his officers instructions in this particular area [sic] as to whom to arrest or whom not to arrest.

In response to a question by the court,[5] the witness replied: "The Witness: We try to engage in selective enforcement, and it's probably best illustrated by traffic. In other words, by an analysis of traffic accidents we determine the cause of accidents and the location and the time of day when they occur and deploy more heavily in those districts at those times and places for that particular situation. And it would apply generally to all types of offenses. In relation to the particular offense involved, we normally do not deploy for it because it's all over town and it happens so rarely that we hope that if there are any arrests and prosecutions that they would be done on the basis of observations on routine patrol." The witness further explained that in some cases "selective enforcement" depends on a judgment concerning the seriousness of the offense.[6] Other factors which are taken into consideration are the number of complaints, the frequency of the crime and, of course, available personnel. In many areas "selective enforcement" means giving the officer or patrol

[5] "The Court: Let me ask you this, Chief Murdock: Do you have any policy in the Police Department relative to the enforcement of misdemeanors wherein—recognizing that officers cannot prosecute the misdemeanors not committed in their presence, do you have any policy with respect to deploying officers for the handling of certain misdemeanor complaints as contrasted with others, sir?"

[6] "The Witness: Well, we try to take first things first. We think that an organized crap game, for example, put on where it's professionally promoted, and so forth, is a greater police problem than a penny-ante poker game in somebody's kitchen. And so we spend more effort to suppress that type of situation."

some latitude.[7] Generally, however, the term "selective enforcement" means "the amount of enforcement effort which is applied in that particular direction."

Defendant Gray testified that he was a member of a political organization which called itself the Non-violent Action committee, "NVAC" for short. In January 1966 NVAC conceived a political program "to try to get the citizens of the State of California interested in what we considered here the important social reform issues . . . and to get them to be aware of these issues so that we would only vote for the politicians that took a strong stand . . ." On June 28, 1966— two days after the incident in question—NVAC held a press conference at which it was explained that the "B---, B---, B---!" posters were part of a campaign in connection with which NVAC was also putting up posters reading "Boycott, Baby, Boycott."[8]

Gray was notified about two or three weeks after June 26 that he would be prosecuted.

Defendant Coleman took the stand just to tell the jury that he did not claim that he had not participated in the activities of the defendant Gray.

Carolyn Sweezy, a student at U.C.L.A. testified as follows: On June 26, 1966 she and one Carson were stopped by a Sergeant Gunn at 53d and Avalon while in the act of putting up "B---, B---, B---!" signs. A criminal charge was pending against her. On other occasions she had also been stopped by members of the Los Angeles Police Department while putting up "B---, B---, B---!" signs. No prosecutions ensued after these other incidents.[9]

### THE INSTRUCTIONS

The trial court instructed the jury with respect to the only defense asserted. Among other things the jury was informed that if it found "that the law which defendants are accused of violating has not been uniformly enforced and that defendants have been intentionally and arbitrarily singled out for prosecution, the defendants are entitled to an acquittal. . . ." The jury was, however, also instructed as follows:

---

[7]"Sometimes when a person gets stopped for a traffic violation, they get a ticket; and other times they get a warning. And they are given some latitude in that . . . ."

[8]The slides in evidence show several such "Boycott, Baby, Boycott" posters. There is no evidence when they were put up.

[9]There is no evidence concerning the reason for such failure to prosecute.

"You are instructed that the fact that others might also have violated the statute in question and have not been arrested or prosecuted therefor should not influence your consideration of the facts in the instant case unless you find by *clear and convincing proof* that the law in this case has been enforced in a discriminatory manner with the intent and purpose to deny equal protection of the law to these defendants. However, discriminatory law enforcement will not be presumed. And before it can be established, proof thereof must be judicially made. The burden of proving discrimination is upon the defendants. Mere laxity in enforcement is not a denial of equal protection of law." (Italics added.)

## CONTENTIONS

On appeal defendants make the following contentions:

1. That they had no burden of persuasion of any kind respecting the defense of discriminatory enforcement. As soon as they established a prima facie case, the prosecution had the burden of negativing the defense by evidence having the usual persuasive force, that is to say "beyond a reasonable doubt."

2. That even if defendants had the burden of persuasion, it was not to persuade the jury "by clear and convincing proof" but only by a preponderance of the evidence.

3. That this court is not bound by any of the facts found by the jury below, but should conduct an independent review of the evidence and that such independent review will establish the defense of discriminatory enforcement.

The People rebut these contentions and claim in addition that there is no such thing as a "defense" of discriminatory enforcement assertable in a criminal prosecution.

Of necessity we first deal with the People's last mentioned contention.

■ There is no particular need to review the somewhat inconsistent positions which have been taken by California appellate tribunals with respect to the availability of discriminatory enforcement of a penal law as a defense to a criminal action. The inconsistency was noted by the compiler of the annotation in 4 American Law Reports, third series, page 404, pages 416-417 "Penal Law — Discriminatory Enforcement." We are quite satisfied that *Two Guys From Harrison-Allentown* v. *McGinley,* 366 U.S. 582, pages 588-589 [6 L.Ed.2d 551, 556-557, 81 S.Ct. 1135] disposes of all arguments, persuasive or otherwise, to the contrary. *Two Guys* was an action against McGinley, the District Attorney of Lehigh

County, Pennsylvania, seeking an injunction against the enforcement of a Sunday closing law. Among other things it was claimed that McGinley had discriminated against plaintiff in enforcing the law. Certain criminal prosecutions under the law against plaintiff's employees were pending. While the case was before a three-judge court a new district attorney for Lehigh County took office. The three-judge court denied the injunction. Affirming, the Supreme Court said: "First, appellant contends that McGinley discriminated against it in enforcing the laws. Recognizing that a mootness problem exists because Lehigh County now has a new District Attorney, appellant contends that there are still pending prosecutions against its employees initiated as the result of the alleged discriminatory action. *Since appellant's employees may defend against any such proceeding that is actually prosecuted on the ground of unconstitutional discrimination,* we do not believe that the court below was incorrect in refusing to exercise its injunctive powers at that time." (Italics added.)

If we felt disposed to apply very strict standards of "how to read a case" to the emphasized portion of the opinion, we could perhaps come to the conclusion that it is not a direct holding on the point we are considering. Frankly, coming as it does from the highest court and being the very basis for an affirmance, it is good enough for us.[10]

Before proceeding to defendants' contentions it seems appropriate to note the following: the question of whether or not the defense of discriminatory enforcement is properly triable to the jury is not before us. The parties simply proceeded to try it to the jury. The propriety of that course is therefore not involved on this appeal. Much can be said for either course of action. (See discussion in 4 A.L.R.3d 404, pp. 412-414; 61 Colum.L.Rev. 1103, pp. 1131-1133.)[11]

---

[10]For the pros and cons of permitting discriminatory enforcement of a penal statute to be raised as a defense to a criminal prosecution, see the authorities cited in 61 Columbia Law Review, page 1103, *The Right to Nondiscriminatory Enforcement of State Penal Laws.*

[11]The appellate department of the superior court, from whose decision this matter is before us on certification, decided the point and, following *People* v. *Utica Daw's Drug Co.,* 16 App.Div.2d 12 [225 N.Y.S.2d 128, 4 A.L.R.3d 393], held that the matter should be tried to the court. As indicated in the text we feel the problem is not properly presented by the appeal; however as a matter of academic interest this much may be stated: one of the advantages of trying the matter to the court on a motion to dismiss, as suggested by the appellate department, is that the People, if unsuccessful, have a right to appeal from the dismissal. This is undoubtedly true where the trial takes place in an inferior court. (Pen.

## Who Has the Burden of Persuasion?

Defendants argue that the burden of persuasion rested with the People once they had introduced substantial evidence of discriminatory enforcement. Whether or not that was so when this case was tried in 1966 is immaterial. For reasons explained later there must be a retrial. The Evidence Code went into effect on January 1, 1967. Under the provisions of that code certain persumptions affect the burden of proof, that is to say "the obligation of a party to establish by evidence a requisite degree of belief concerning a fact in the mind of the trier of fact or the court." (Evid. Code, §§ 115, 605, 606.) Among those presumptions which the Legislature has designated as affecting the burden of proof is the presumption that "official duty has been regularly performed." (Evid. Code, § 664.) Since the defense of discriminatory enforcement is a claim that official duty has not been regularly performed, the presumption is obviously applicable and its effect is "to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact." (Evid. Code, § 606.)

### Quantum of Proof Required

The trial court apparently felt persuaded by *People v. Utica Daw's Drug Co.*, 16 App.Div.2d 12 [225 N.Y.S.2d 128, 4 A.L.R.3d 393] and instructed the jury that defendant had to establish discriminatory enforcement "by clear and convincing proof." This instruction was emphasized by the prosecutor in his closing argument. We think it was error. First, however persuasive an authority *People v. Utica Daw's Drug Co., supra,* may be, the case does not really say that the burden rests on defendant to prove discriminatory enforcement "by clear and convincing proof." At one point the court says that the burden is on the defendant "by a clear preponderance of the proof." On its face this is not quite the same as "clear and convincing proof." In two other places of the opinion the court refers to the "heavy burden" which rests on the defendant. These statements, however, are equally reconcilable with a meaning that, whatever may be the proper

Code, § 1466.) It would not be true if the charge is a felony and the dismissal is by a superior court. (Pen. Code, § 1238; *People v. Valenti,* 49 Cal.2d 199, 204-208 [316 P.2d 633].) For what it is worth, the highest court of the State of New York apparently does not agree with the Appellate Division of the Supreme Court which decided *People v. Utica Daw's Drug Co., supra.* (See *People v. Walker,* 14 N.Y.2d 901 [200 N.E.2d 779].)

quantum, the defense is a very difficult one to establish. Certainly the instant case so demonstrates.

Although no case which we have read says so in so many words, the recognition of discriminatory enforcement of a penal law as a defense to a criminal action is one of the few means the individual citizen has to force public officials to do their job properly. Perhaps one of the unarticulated reasons why discriminatory enforcement is recognized as a defense to a criminal prosecution is pretty much the same as the basis for the rule excluding illegally obtained evidence. We refuse to admit such evidence because we know of no other way to force law enforcement agencies to obey the law. (*Mapp* v. *Ohio*, 367 U.S. 643, 651 [6 L.Ed.2d 1081, 1087-1088, 81 S.Ct. 1684, 84 A.L.R.2d 933] ; *People* v. *Cahan*, 44 Cal.2d 434, 445 [282 P.2d 905, 50 A.L.R.2d 513].) It must be presumed that legislatures intend that the laws they pass be impartially applied. The availability of discriminatory enforcement as a defense thus serves a good purpose: it acts as a constant reminder to the executive that the will of the people, expressed through the legislative branch, should be obeyed.

To rule that a defendant must carry the heavy burden of proof imposed by the trial court's instructions, is to hold that equal protection may be denied if the denial cannot be clearly and convincingly proved. We doubt that the Fourteenth Amendment sanctions so cynical a posture.[12]

Relative convenience in gathering the facts pertaining to a particular defense frequently is decisive in allocating the burden of proof. There is no reason why this consideration should not also affect the quantum of evidence required to sustain that burden. Evidence of discriminatory enforcement usually lies buried in the consciences and files of the law enforcement agencies involved and must be ferreted out by the defendant. Indeed, the case at bar involved a relatively easy presentation of the defense since possible violations of section 28.03 were literally plastered all over town. In the average case, however, the imposition of a burden heavier than proof by a preponderance of the evidence might mean the nullification of the defense as a practical matter.

There is nothing, we think, to the notion that the lesser burden will stimulate specious assertions of discriminatory

[12]It is of interest that the Evidence Code specifically provides that two presumptions affecting the burden of proof—legitimacy (§ 661) and beneficial ownership (§ 662)—can be rebutted only by clear and convincing proof. No such provision appears in section 664 (official duty regularly performed.)

enforcement. One would have to posit defendants willing to assert the defense if faced with the necessity of proving it by preponderance of the evidence, but deterred from doing so by a requirement of clear and convincing proof. Such reticence would be quite surprising.

### INDEPENDENT REVIEW OF THE EVIDENCE

█ Defendants finally argue that we ought to disregard the fact finding process that took place below and undertake an independent review of the evidence. A corollary to that proposition is the argument that such independent review will lead to the conclusion that defendants have been the victims of discriminatory enforcement and that we should order the prosecution to be dismissed.

This suggestion raises a host of problems. To be sure the Supreme Court of the United States has often exercised an independent review over the state fact finding process and our own Supreme Court has followed suit on occasion (*Zeitlin* v. *Arnebergh*, 59 Cal.2d 901, 908-911 [31 Cal.Rptr. 800, 383 P.2d 152, 10 A.L.R.3d 707]). Just exactly what the Supreme Court of the United States does when it exercises this power is a matter of some dispute.[13] There appears to be some disagreement on the high court itself.[14] Even in the coerced confession cases where the doctrine of an independent review is most frequently enunciated, certain portions of the trial fact finding process are accepted.[15]

We see no reason to venture into this no-man's land at this time. Certainly before an appellate court should undertake to

---

[13]See the extensive and subtle analysis of the problem in the comment *Supreme Court Review of State Findings of Fact in Fourteenth Amendment Cases*, 14 Stanford Law Review, page 328.

[14]See *Culombe* v. *Connecticut*, 367 U.S. 568 where, at page 603 [6 L.Ed.2d 1037, 1058, 81 S.Ct. 1860], Justice Frankfurter starts to explain the process, an explanation which the Chief Justice, in a concurring opinion, characterizes as a ''lengthy and abstract dissertation'' on a question not presented by the record or necessary to a disposition of the case.

[15]''In a case coming here from the highest court of a State in which review may be had, the first of these phases is definitely determined, normally, by that court. Determination of what happened requires assessments of the relative credibility of witnesses whose stories, in cases involving claims of coercion, are frequently, if indeed not almost invariably, contradictory. That ascertainment belongs to the trier of facts before whom those witnesses actually appear, subject to whatever corrective powers a State's appellate processes afford.

''This means that all testimonial conflict is settled by the judgment of the state courts. . . .'' (*Culombe* v. *Connecticut, supra,* p. 603 [6 L.Ed.2d p. 1058].)

delineate and then exercise so extraordinary a power, the case should come to it after a trial in which the issue was considered by the appropriate trial court finder of fact under proper standards. Such was not the case here.[16] This does not mean, of course, that if defendants have established discriminatory enforcement *as a matter of law*, they are not entitled to a dismissal.

We have set forth the facts at some length, because we think they demonstrate that a finding that there has been no discriminatory enforcement is supported by the record. To be sure in 1966 section 28.03 was not enforced against anyone but defendants and another couple who had done precisely what defendants had done. Many, many violations of the section had taken place during that year. There is even some evidence which suggests that some violators of the section were observed by the police in the act of violation and not even questioned. Yet one of those violators—Miss Sweezy— was on several occasions posting the very signs against which the discriminatory enforcement was allegedly directed. Just what motivated the police not to investigate other apparent violations we do not know, but the fact that several of them involved the same sign that defendants put up, makes the conclusion of purposeful discrimination less than compelling.

"The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination." (*Snowden* v. *Hughes*, 321 U.S. 1, 8 [88 L.Ed. 497, 503, 64 S.Ct. 397].[17]

Defendants recognize all this, but argue that the statistical method employed by the Supreme Court of the United States

[16]It should be noted that the problem of an independent appellate review of the evidence is entirely different from the other matter we do not decide, namely, whether the defense of discriminatory enforcement is triable to the jury or the court. The preliminary questions of fact which govern the admissibility of a confession must be tried and decided primarily by the trial court rather than the jury (*Sims* v. *Georgia*, 385 U.S. 538, 544 [17 L.Ed2d 593, 598, 87 S.Ct. 639]; *Jackson* v. *Denno*, 378 U.S. 368 [12 L.Ed.2d 908, 84 S.Ct. 1774, 1 A.L.R.3d 1205]) yet it is precisely in that area that the Supreme Court has most often exercised its power of independent review.

[17]*Snowden* v. *Hughes*, *supra*, also contains the statement that ". . . there must be a showing of 'clear and intentional discrimination.' " Nothing said in this opinion concerning the burden of proof is to the contrary. What must be shown is one thing, the persuasive force of the evidence by which it is shown, is another.

in a series of jury discrimination cases establishes the defense nevertheless.

The Supreme Court's statistical approach in these jury discrimination cases was recently thoroughly analyzed. (Finkelstein, *The Application of Statistical Decision Theory to the Jury Discrimination Cases,* 80 Harv.L.Rev. 338.) While we do not pretend to understand the mathematical formulae employed by the author of this analysis, this much appears certain: the jury discrimination cases involve a comparison between the number of Negroes who, in the past, have been selected for jury duty with the number of Negroes eligible for such duty.[18] A comparison of the large number of eligibles to the small number chosen leads to the conclusion that there has been discrimination.

A case such as the one at bar is quite different. The evidence does not really establish the number of violations known to the police. To be sure they knew of many violations from citizens' complaints, but did not know who had committed them. There is also some evidence that they observed apparent violations by others which they did not investigate by ascertaining from the owner of the property involved whether he had given consent. But, as we have already noted, that argument cuts both ways because some of those apparent violations involved the posting of "B---, B---, B---!" signs. The necessary mathematical basis for comparison which we find in the jury discrimination cases is therefore nonexistent here and any rules which defendants would derive from those cases and apply here are not pertinent.

The evidence is just as easily explainable as an instance of selective enforcement as it is in terms of discriminatory enforcement. "Moreover, the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation. Even though the statistics in this case might imply a policy of selective enforcement, it was not stated that the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.

---

[18] "A basic legal principle in the jury discrimination cases is that the selection of an improbably small number of Negroes is evidence of discrimination. This principle, which links a finding of discrimination to a determination of probabilities, opens the door to the use of statistical analysis in these cases. The mathematical methods described here have been used to calculate the probabilities which the law has established as relevant for determining the existence of discrimination." (80 Harv. L.Rev. 338, p. 374.)

Therefore grounds supporting a finding of a denial of equal protection were not alleged.'' (*Oyler* v. *Boles,* 368 U.S. 448, p. 456 [7 L.Ed.2d 446, 453, 82 S.Ct. 501].)

The orders are reversed for the sole reason that the court's instructions put too heavy a burden of proof on defendants.

Stephens, J., and McCoy, J. pro tem.,* concurred.

Respondent's petition for a hearing by the Supreme Court was denied November 8, 1967.

*Assigned by the Chairman of the Judicial Council.