[Civ. No 31648. Second Dist., Div. Five. Feb. 17, 1969.]

WILLIAM LAWRENCE BARKIN, Plaintiff and Appellant, v. BOARD OF OPTOMETRY OF THE STATE OF CALIFORNIA, Defendant and Respondent.

Ostrow & Drucker, Ostrow, Drucker, Nasatir & Kuret and Leonard Nasatir for Plaintiff and Appellant.

Brundage & Hackler and Daniel Feins as Amici Curiae on behalf of Plaintiff and Appellant.

Thomas C. Lynch, Attorney General, Warren H. Deering and Stephen H. Silver, Deputy Attorneys General, for Defendant and Respondent.

Wilke, Fleury, Sapunor & Hoffelt and William A. Gould, Jr., as Amici Curiae on behalf of Defendant and Respondent.

KAUS, P. J.—On December 22, 1964, an accusation was filed before the respondent Board charging petitioner with violations of sections 651, 651.3, 3125 and 3129 of the Business and Professions Code.[1] After extensive hearings before a hearing officer a proposed decision was filed with the Board on October 20, 1965. The Board decided not to adopt it. Argument was had before the full Board on March 17, 1966. By that time a transcript of the proceedings before the hearing officer had been prepared and had been read by all of the board members.[2]

---

[1] All code references in this opinion, unless otherwise noted, are to the Business and Professions Code. Sections 651, 651.3 and 3129 forbid certain types of advertising. Section 3125 prohibits the practice of optometry under a false or assumed name.

[2] Although petitioner does not make it a separate point on appeal, there is a suggestion in his brief that somehow the refusal of the Board to adopt the hearing officer's proposed decision before the preparation of a reporter's transcript of the hearing violated his rights. We find nothi g in the statutes (Gov. Code, §§ 11500-11528) which makes the privilege of an agency not to adopt a proposed decision of a hearing officer dependent on the availability of a transcript at the time of the refusal. Even if in a particular situation a person accused before an agency could be prejudiced by the agency's refusal to adopt a proposed favorable decision without having read the reporter's transcript, this case is a poor vehicle for the establishment of such prejudice, since the facts are not

On April 16, 1966, the Board rendered its decision, finding that petitioner had violated the designated code sections and imposed discipline, the severity of which is not in issue Reconsideration was denied.

On May 17, 1966, petitioner filed in the superior court a petition for a writ of mandate to compel the Board to set aside its decision. (Gov. Code, § 11523.) An alternative writ issued, the Board answered the petition and on January 25, 1967, the superior court filed its findings of fact and conclusions of law to the effect that a judgment should be entered discharging the alternative writ and denying a peremptory writ. Judgment followed and petitioner appealed. This court granted a stay of the administrative decision, pending the appeal.

The superior court exercised its independent judgment on the evidence and found that the Board's findings were supported by the weight of the evidence. (*Moran* v. *Board of Medical Examiners,* 32 Cal.2d 301, 308-309 [196 P.2d 20].) The court also found that the decision of the Board was supported by the findings.

Since the correctness of the findings—as distinguished from the legal conclusions drawn therefrom—is not attacked, we summarize them briefly: in February 1963, petitioner presented a plan[3] to the Los Angeles County Federation of Labor A.F.L.-C.I.O. ("Federation"), an organization of union locals in Los Angeles County. He offered to start and maintain an optical service for union members and their families. The plan contemplated the adoption of a specific price schedule for eye examinations, glasses and contact lenses. Under that schedule glasses would cost $21 per pair less than the average cost in Los Angeles County. Between February and April 1963, petitioner acquired a building from which the proposed service to union members was to be rendered. On the front of the building there was a sign reading: "Union Vision Service" ("U.V.S.") about 20 feet long with letters 1½ feet high.[4]

---

really in dispute and the Board's eventual disagreement with the hearing officer was solely on questions of law which were clearly delineated by his proposed decision.

[3]At this point we do not use the word "plan" as a word of art. As will be seen, the principal issue on this appeal is whether or not petitioner's proposal, when put into effect, was a "medical service plan" within the meaning of section 651.3.

[4]Petitioner carried on the practice of optometry from that building and from a second U.V.S. building which he opened later in another part of Los Angeles County. He employed other optometrists to assist him.

The Federation approved petitioner's plan on April 18, 1963, and permitted him to advise local unions of the approval. Petitioner then prepared[5] and distributed to union members brochures outlining the features of his services for distribution to the members of union locals. These brochures included the fees, costs and prices of eye examinations, glasses and contact lenses. In some cases no charge was to be made for examinations. The printed material also had language such as "Save up to 50% on your glasses" and other similar language to the effect that savings up to 50 percent were being offered. These brochures were printed in whole or in part on the facsimile of the letterheads of four specific locals. Some of the brochures also contain statements to the effect that eye examinations were "prepaid by union." In truth the examinations were free.[6]

Together with the literature concerning available services and prices, the union members received a numbered, wallet-sized card bearing the name "Union Vision Service" and respondent's facsimile signature in which he identified himself as "Professional Director."

On November 15 and 22, 1963, one Keith W. Hooper engaged petitioner's services. Through an employee and personally, petitioner informed Hooper that the price of glasses he was purchasing was about 50 percent of what they would cost elsewhere.[7]

The court made no detailed evidentiary findings concerning the initial dealings between petitioner and the Federation or with respect to the negotiations between petitioner and the various locals. The record shows that the initial contact between petitioner and the Federation was made on petitioner's initiative. After the Federation approved his plan petitioner asked for a list of locals with which he could get in touch. He was refused and it was suggested that he place an advertisement in a labor newspaper. This was done.

Petitioner then got in touch with at least four different union locals which also approved his plan.[8] His brochures

---

[5]The precise finding is that petitioner did "compose or materially assist in the composing, arrange for, and pay the cost of printing, and in most cases the cost of transmission by mail of, certain brochures . . ."

[6]Since, except for the contentions discussed in this opinion, it is not claimed that the brochures did not come within the purview of sections 651, 651.3 and 3129 we do not set forth their contents at greater length.

[7]Hooper was an investigator for the Department of Professional and Vocational Standards, who procured petitioner's services by posing as a union member under an assumed name.

[8]One of petitioner's own exhibits is an advertisement in a union news-

were then mailed to the members of the locals on the locals' letterheads. However the entire cost of the mailing was borne by petitioner.

Additional facts will be referred to in connection with the discussion of petitioner's contentions.

## I.

 Petitioner claims that the superior court committed error when it refused to allow him to present evidence—and to take depositions for that purpose—to show that all members of the Board, except the public member (Bus. & Prof. Code, § 3010), were biased and prejudiced against him. The charges of bias and prejudice derive from the following, which petitioner offered to prove in the superior court: the five professional members of the Board were all members of the California Optometric Association ("Association") and of California Vision Service ("C.V.S.") which was operated, serviced and sponsored by the Association. C.V.S. negotiates contracts with various unions for optometric services at certain fees and was therefore directly competitive with petitioner's U.V.S. The charges made by U.V.S. are lower than those of C.V.S. and the Board members had made statements in the past that U.V.S., a "price cutting operation," was detrimental and should be eliminated.

The trial court did not permit petitioner to prove his allegations because the petition for the writ of mandate did not charge bias and prejudice and because they were made too late.

The trial court was correct. Section 1094.5, subdivision (d) of the Code of Civil Procedure permits the trial court to admit relevant evidence not adduced before the administrative agency only where such evidence could not have been produced there in the exercise of reasonable diligence. Petitioner has made no showing of any kind why the evidence could not have been made part of the record at the administrative level. It may be that neither the hearing officer nor the Board would have allowed it, for section 11512, subdivision (c) of the Government Code provides as follows: ". . . No agency member shall withdraw voluntarily or be subject to disqualification if his disqualification would prevent the existence of a quorum qualified to act in the particular case."[9] This does not excuse petitioner's failure to even offer it.

paper claiming that as of March 26, 1965, some 45 union locals "participated" in U.V.S.

[9]This appears to be a statutory application of the so-called "rule of

Further, of course, there is no showing how any alleged bias or prejudice of the Board members affects petitioner's present status as an appellant from a judgment of the superior court denying the issuance of a writ of mandate. The Board did not prevent him from offering any evidence which might be relevant to the judgment of that court, which was based on an independent review of the record. (*Moran* v. *Board of Medical Examiners, supra,* 32 Cal.2d 301, 308-309.)

## II.

Petitioner claims that these proceedings deny him the equal protection of the law because of the Board's failure to institute proceedings against the professional members of C.V.S. which, he claims, is also subject to discipline if it is ultimately decided that he is. (*Yick Wo* v. *Hopkins,* 118 U.S. 356, 373-374 [30 L.Ed. 220, 227-228, 6 S.Ct. 1064] ; *People* v. *Gray,* 254 Cal.App.2d 256 [63 Cal.Rptr. 211].) The record before us shows that C.V.S. is a nonprofit corporation organized under the provisions of section 9201 of the Corporations Code. That section permits the formation of nonprofit corporations for the purpose of defraying or assuming the cost of professional services of licentiates of the healing arts (Bus. & Prof. Code, div. 2), or of rendering such service, under strict conditions prescribed by the Legislature. Petitioner can make no such claim. It may be, as petitioner suggests, the C.V.S. and he are both guilty of the violations he has been found to have committed, or it may be that neither is. The point is that there is a sufficient difference between C.V.S.'s way of doing business and petitioner's to suggest a rational distinction. (*McGowan* v. *Maryland,* 366 U.S. 420 [6 L.Ed.2d 393, 81 S.Ct. 1101] ; *West Coast Hotel Co.* v. *Parrish,* 300 U.S. 379 [81 L.Ed. 703, 57 S.Ct. 578, 108 A.L.R. 1330] ; *California Physicians' Service* v. *Garrison,* 28 Cal.2d 790, 802-803 [172 P.2d 4, 167 A.L.R. 306].)

## III.

It is claimed that the evidence does not support the court's finding that petitioner violated section 651. Section 651 reads as follows: ''It is unlawful for any person licensed under this division or under any initiative act referred to in this division to offer for sale or to sell any commodity or to offer to render or to render any service under the representa-

necessity.'' (*Caminetti* v. *Pacific Mut. Life Ins. Co.,* 22 Cal.2d 344, 366 [139 P.2d 908] ; *Gonsalves* v. *City of Dairy Valley,* 265 Cal.App.2d 400, 404 [71 Cal.Rptr. 255]; 73 C.J.S. 389; 1 Am.Jur.2d 862.)

tion that the price or fee which is to be, or is, charged for such commodity or service, or both, is at a discount, or under the representation that the price or fee which is to be, or is, charged for such commodity or service, or both, is at a percentage or otherwise less than the average fee or price then regularly charged under like conditions by the person so licensed or by other persons for such commodity or service or commodity and service. The provisions of this section shall not be construed to modify or establish prices or fees or to modify or affect in any manner any other provision of this division.''

Citing no cases, but presumably relying on *NAACP* v. *Button*, 371 U.S. 415 [9 L.Ed.2d 405, 83 S.Ct. 328]; *Railroad Trainmen* v. *Virginia Bar*, 377 U.S. 1 [12 L.Ed.2d 89, 84 S.Ct 1113, 11 A.L.R.3d 1196]; and *Mine Workers* v. *Illinois Bar Assn.*, 389 U.S. 217 [19 L.Ed.2d 426, 88 S.Ct. 353], petitioner asserts that it is an undue restriction on his right of free speech to discipline him for aiding unions in composing ''their'' material or contributing to the cost of printing and transmitting the material to the members of the union.

Petitioner's characterization of his role in drafting and financing of the brochures as merely ''aiding and contributing'' is unduly modest, but more fundamentally there is nothing in any of those csses which would prevent a state from disciplining members of the Bar for participating in the dissemination of information practice by the NAACP, the Trainmen and the Mine Workers. In *Railroad Trainmen* v. *Virginia Bar, supra,* the Supreme Court says: ''. . . Here what Virginia has sought to halt is not a commercialization of the legal profession which might threaten the moral and ethical fabric of the administration of justice. It is not 'ambulance chasing.' The railroad workers, by recommending competent lawyers to each other, obviously are not themselves engaging in the practice of law, *nor are they or the lawyers whom they select parties to any soliciting of business. . . .*'' (377 U.S. at pp. 6-7 [12 L.Ed.2d at pp. 93-94]. Italics added.) The point has no merit.

Petitioner also argues that because his operation ''was like no other'' he could not be found to have made his offers at prices lower than those ''regularly charged under like conditions.''

In *Cozad* v. *Board of Chiropractic Examiners,* 153 Cal.App. 2d 249 [314 P.2d 500], a chiropractor was charged with violations of section 651. He too argued that he and his associates

rendered services under "certain special conditions." The argument was rejected, the court pointing out that the licensee in question had testified that the examination which he had advertised for $1.00 was the same as the examination for which he claimed that the other charged $5.00. The same is true here. To determine whether the conditions are similar, we do not look at the methods by which a licensee generates a practice, but at the situation from the point of view of the patient. It would be a perversion of the intent of section 651 to permit advertising under the banner of "equal treatment for less money" simply because the advertiser can show that in some fashion, quite immaterial to the patient, the conditions which permit him to render less expensive service are unlike those of his fellow practitioners with whom he compares himself.

*Cozens* v. *Board of Chiropractic Examiners, supra,* also disposes of petitioner's further point that section 651 is unconstitutionally vague.

### IV.

Petitioner claims that the finding of a violation of section 651.3 is not supported by evidence and that, in any event, he comes within the terms of the proviso which makes the section inapplicable to "the furnishing of information regarding benefits available, and charges therefor, under the coverage of any hospital or medical service or insurance plan."

The relevant part of section 651.3 reads as follows: "No person licensed as a physician and surgeon, optometrist, or registered dispensing optician shall advertise or cause or permit to be advertised, any representations in any form which in any manner whether directly or indirectly refers to the cost, price, charge or fee to be paid to such licensed person for any commodity or commodities sold by such licensed person or any service or services performed by such licensed person when those commodities or services are furnished in connection with the professional practice or business for which he is licensed; provided, however, that the provisions of this section do not apply to the furnishing of information regarding benefits available, and charges therefor, under the coverage of any hospital or medical service or insurance plan. . . ."

The argument that petitioner has not violated section 651.3, even without benefit of the proviso, is based on petitioner's contention that his brochures did not address themselves to

"the public." This contention is advanced although there is no language in section 651.3 which would limit its application to instances where the advertising is directed to the "public." Petitioner argues that the definition of "advertising" found in section 3000[10] somehow limits the prohibitions of section 651.3, at least as applied to optometrists. Section 3000 is found in chapter 7 of division 2, which chapter contains certain specific provisions concerning optometrists. By its terms the definition is applicable only to chapter 7. Section 651.3 is found in chapter 1, the general provisions applicable to all the healing arts.

We do not have to decide whether the attempted transplant is successful, for as we shall see the point that petitioner did not address himself to the "public" has no merit, even when considered in connection with his argument to the effect that he has not violated section 3129, a section applicable to optometrists only and, admittedly, governed by section 3000.

We now reach what is really the heart of this appeal, the question whether or not by informing union members of the lower prices available at U.V.S., petitioner was merely furnishing information concerning benefits and charges under the coverage of a "medical service plan." Petitioner, of course, claims that he was and we have no reason to doubt his good faith. Nor do we question his assertion and that of several of his witnesses that he provided a much needed low cost optometric service to union members and their families, patients who but for his service might never have received necessary eye examinations or glasses. The question is simply whether the Legislature intended that an operation like petitioner's should fall under the proviso to section 651.3.

Neither the section as a whole nor the proviso has ever been construed. No statutory or judicial definition of the specific term "medical service plan" has been brought to our attention or found by us.[11]

---

[10]Section 3000 reads as follows: "*As used in this chapter,* the term 'advertise' and any of its variants include the use of a newspaper, magazine or other publication, book, notice, circular, pamphlet, letter, handbill, poster, bill, sign, placard, card, label, tag, window display, store sign, radio announcement or any other means or methods now or hereafter employed to bring to the attention of *the public* the practice of *optometry* or the prescribing, fitting or sale, in connection therewith, of lenses, frames, or other accessories or appurtenances. . . ." (Italics added.)

[11]It is not seriously contended that because petitioner's plan, if such it was, provided for optometric services only, it was not a medical service plan. The Attorney General does point out that when opthalmological services were needed by a patient, he was referred to an ophthalmologist

We believe it is reasonable to conclude that when, in 1961, the year section 651.3 was enacted, the Legislature spoke of a "medical service plan" it had in mind such plans, providing for specific benefits and charges, as had then been recognized by law.

Assuming for the moment that the term "medical service plan" is roughly synonymous with "health plan," we find that before the passage of section 651.3 the Supreme Court had dealt with health plans on at least three occasions, without however having had to define the concept. In *People* v. *Pacific Health Corp., Inc.*, 12 Cal.2d 156 [82 P.2d 429, 119 A.L.R. 1284], a stock corporation, operated for profit, was found to be illegally engaged in the practice of medicine. It had issued contracts undertaking to pay for medical service to be rendered by physicians designated by the defendant. The doctors were paid from funds collected from the contract holders which were paid into defendant's general fund. Although the opinion does not expressly say so, it is quite clear that the monies collected from the contract holders were not only prepaid, but paid regardless of whether the need for medical services ever arose.

In *California Physicians' Service* v. *Garrison, supra,* 28 Cal.2d 790, the court held that the medical plan of the plaintiff, organized under section 9201 of the Corporations Code— then section 593a of the Civil Code—was immune from supervision by the Insurance Commissioner. This time the opinion emphasized that payments to the plan were made "on a periodic budgeting basis." (28 Cal.2d at p. 794.) Finally, in *Complete Service Bureau* v. *San Diego County Medical Soc.,* 43 Cal.2d 201 [272 P.2d 497], the plan of a nonprofit corporation organized under section 9200 of the Corporations Code withstood assorted attacks by the San Diego County Medical Society and individual physicians. Again the plan featured periodic prepayments on the part of its members for which they received certain designated benefits.

In *Maloney* v. *American Independent Medical & Health Assn.,* 119 Cal.App.2d 319 [259 P.2d 503], the insurance commissioner was permitted to take charge of an insolvent nonprofit corporation which operated a health plan which featured the payment of "membership dues" in advance.

---

who was present on petitioner's premises at regular times. The consequences of a holding that optometrists do or do not furnish medical services are so far reaching in this and related fields, that we must shy away from deciding that issue until it is tendered less reluctantly than here.

It is seen, then, that at the time of the enactment of section 651.3 periodic prepayment was a common feature of all health plans which had come before the courts.

Legislation enacted since the passage of section 651.3 demonstrates that when the Legislature thinks about health plans, it thinks of periodic prepayment. Thus, for example, in the Meyers-Geddes State Employees' Medical and Hospital Care Act (Gov. Code, § 22751 et seq) a "carrier" is an entity which provides certain services "in consideration of premiums or other periodic charges payable to it." (Gov. Code, § 22754, subd. (c).) A "health benefits plan" is a plan provided by a "carrier." (Gov. Code, § 22754, subd. (d).)[12]

In 1965 the Legislature enacted the so-called Knox-Mills Plan Act (Gov. Code, § 12530 et seq), which subjects what it calls "health care service plans" to supervision by the Attorney General. A health care service plan is defined in subdivision (a) of section 12530 of the Government Code. Again the definition features "prepaid or periodic charges."[13]

We do not hold that section 651.3 cannot refer to a "medical service plan" which does not come within the definition of the Meyers-Geddes or Knox-Mills Acts, but we do think it significant that the prepayment feature is a common thread not only in the decisional but also in the statutory law of this state.

So far we have used the terms "medical service plan" (§ 651.3), "health benefits plan" (Gov. Code, § 22754) and "health care service plan" (Gov. Code, § 12530) interchangeably. Closer inspection of the decisional law, particularly *California Physicians' Service* v. *Garrison, supra,* and *People ex rel. Roddis* v. *California Mut. Assn.,* 68 Cal.2d 677 [68 Cal.Rptr. 585, 441 P.2d 97], discloses that the term "service" is, in this field, a term of art. A "service" plan is distinguished from an "insurance" plan in that the latter features

---

[12]The Meyers-Geddes Act was enacted as chapter 1236 of the statutes of 1961. Section 651.3 was part of chapter 199.

[13]Which health plans come within the purview of the Knox-Mills Plan Act and which do not was decided, at least in part, in *People* ex rel. *Roddis* v. *California Mut. Assn.,* 68 Cal.2d 677 [68 Cal.Rptr. 585, 441 P.2d 97]. That case provided certain guidelines to aid in determining whether a health plan comes within the exception to the Knox-Mills Plan Act which exempts from its coverage plans operated by an "insurer." The Knox-Mills Plan Act also exempts certain other arrangements which might otherwise come within its definition of a "health care service plan." None resemble petitioner's operation.

indemnity paid to the ''insured.''[14] It reimburses him for all or part of an obligation which he has incurred. The principal feature of a ''service'' plan, on the other hand, is that as far as the benefits provided by it are concerned, the physician has agreed to look exclusivly to the plan for payment. The member owes nothing.

That the Legislature had the technical meaning of the word ''service'' in mind is strongly suggested by the fact that it is juxtaposed to the word ''insurance.'' By no stretch of the imagination did petitioner advertise a ''service plan'' within the accepted technical meaning. However low his charges might have been, it was the patient who had to pay them.

Further, the word ''coverage'' has an accepted meaning in the insurance business. If the Legislature had meant to include operations such as petitioner's in the proviso to section 651.3 the word ''coverage'' is singularly inappropriate. One does not talk of the ''coverage'' of a price list.

Finally, when section 651.3 talks of ''plan,'' whose plan does it mean? Every medical professional, whether he intends to run an office for the upper crust or for low income groups, has a ''plan'' on how to build a practice. This does not make it the plan of the patient until he is in need of the services offered. True, the brochure mailed by petitioner to his prospective patients contained the numbered wallet-sized card mentioned early in this opinion. At least some of the brochures informed the addressee that in order to be eligible for petitioner's ''basic fee schedule'' it would be necessary to telephone his office and ''register'' the number within 10 days of receipt of the brochure. If the recipient did not do so, according to one of the brochures, the eye examination would not be free. This obvious ''come on''[15] which entailed no obligation whatever on the part of the recipient, hardly made him a member of the plan. Reduced to its simple facts petitioner's ''plan'' amounted to this: by selling his service to certain union representatives and obtaining their endorse-

[14]More precisely, *People* ex rel. *Roddis* v. *California Mut. Assn., supra,* holds: ''. . . We, therefore, conclude that where indemnity is a significant financial proportion of the business, the organization must be classified as an 'insurer' for the purposes of the Knox-Mills Plan Act. . . .'' (68 Cal.2d at p. 683.)

[15]On two of the brochures the language is as follows: ''There is only one requirement. YOU must call AN 9-7474 *within 10 days from today* and register the red number on the enclosed U.V.S. membership card. (You can make your appointment then or within the next 90 days.)'' The prospect on the phone seems to have been petitioner's equivalent to the foot in the door.

ment, he was given access, by mail, to thousands of prospective patients whom he circularized at his own expense. He was not bound contractually to the union or to the patient to provide services at the schedules indicated in his literature.[16] By this method he obtained access to a total of 515,000 union members of which, at the time of the administrative hearing 71,000 had become patients! It may well be that many of these would never have found their way to an optometrist except for petitioner's advertising. It may also be true that petitioner's way of practicing optometry is the better way from the point of view of the general public. That judgment is, of course, for the Legislature.

One final red herring on this subject: after three of the four union locals prominently involved in the evidence in this proceeding had been solicited and circularized, petitioner caused a nonprofit corporation to be formed. There is no evidence that it complied with the stringent provisions of section 9201 of the Corporations Code and we therefore must assume that it was formed under the provisions of section 9200 of that code. In some unexplained fashion petitioner seeks to use the existence of this corporation as a shelter. According to petitioner the corporation, Union Health and Welfare of California, was "set up in order not to control but to distribute profits of Union Vision Service which is sponsored and controlled by the Union Health and Welfare Services." The corporation was designed to render other medical and dental services to union members. It was the "mother" of these other services. It had a board of directors and an address different from that of U.V.S. That is about all we know about the corporation. This vague evidence should be contrasted with petitioner's own testimony when questioned about the brochures: ". . . Now, this statement appears in all of your brochures with that in mind. Are you still sure? A. They are not my brochures, please. They are not my brochures. Q. These are the brochures of Union Vision Service? A. They aren't mine. Q. Who owns Union Vision Service? A. I am the owner. Q. Any other stockholders? A. No. We don't have any stock."

---

[16]Petitioner himself testified that he and the unions agreed that his charges would vary up and down depending upon business. In any event the brochures left adequate loopholes for the charging of higher prices. Some said: "For special lenses or deluxe frames a nominal additional charge will be made." Another said that the prices of glasses "start at" a given figure.

## V.

■ Petitioner claims that the finding of a violation of section 3129 is not supported by substantial evidence.

Section 3129 reads as follows: "It is unlawful to advertise at a stipulated price, or any variation of such a price, or as being free, any of the following:

"The examination or treatment of the eyes; the furnishing of optometrical services; or the furnishing of a lens, lenses, glasses, or the frames or fittings thereof.

"The provisions of this section do not apply to the advertising of goggles, sun glasses, colored glasses or occupational eye-protective devices, provided the same are so made as not to have refractive values."

It is first claimed that the proviso to section 651.3 must be held to apply to section 3129. We do not have to come to grips with that contention, since the proviso does not help petitioner.

Further, by reference to the definition of "advertising" in section 3000, it is claimed that petitioner did not advertise because he did not address himself to the "public." The argument is that although he admittedly sent his brochures to many thousands of union members, he did communicate only to union members and not to the public at large.

In *Mary Pickford Co.* v. *Bayly Bros. Inc.,* 12 Cal.2d 501 [86 P.2d 102], the question was whether certain securities had been offered to the "public." The securities in question had been offered to a small number of persons selected at random, The court held: "This method certainly constituted an offering to the 'public'. Corpus Juris states that the word does not have a fixed or definite meaning; in one sense 'the word does not mean all the people, nor most of the people, nor very many of the people of a place, but so many of them as contradistinguishes them from a few'. (50 C.J. 844, 845.) Webster's New International Dictionary, second edition, gives among other definitions of the word, 'a particular body or section of the people; often specifically, a clientele'. While the group solicited by defendants in this case was a comparatively small one, it nevertheless constituted the 'public' so far as the purposes of the Corporate Securities Act are concerned. Sales were made in pursuance of a general plan to dispose of a substantial portion of the beneficial interest in the trust for the purpose of raising capital to carry out the venture. This, in the absence of a permit, constituted a violation of the Corporate Securities Act (*People* v. *Craven,* 219 Cal. 522 [27

P.2d 906] *supra*; *Black* v. *Solano County*, 114 Cal.App. 170 [299 P. 843]).'' (12 Cal.2d at p. 514.)

In *Askew* v. *Parker*, 151 Cal.App.2d 759 [312 P.2d 342], the question was whether a swimming pool maintained by the defendant was a public pool within the meaning of section 24100 of the Health and Safety Code. The pool in question was owned by a religious foundation. Invitations to use the pool had been mailed to all post office box and R.F.D. box holders at Valley Center—about 300 to 400 persons—and' to all teen-age children in that community. About 100 children registered to use the pool and it was regularly used by about 40 to 60 of them. The court held that the pool was public, having in mind the purpose of the public health statute of which section 24100 was a part. ''. . . In such a situation the word 'public' must be given as broad a definition as is necessary to provide the protection to the public which the Legislature sought to provide. (3 Sutherland on Statutory Construction, 3d ed., § 7202, p. 397.) A pool may be public although all persons do not have a right to be admitted, and a pool may be public even though certain persons can be legally excluded from it. Whether a charge is made for admission is not necessarily a determining factor. The public health is not particularly affected by the transfer of money from patron to operator, but it is affected by the physical contact of many persons with a particular swimming pool unless precautions are taken. (*Edwards* v. *Hollywood Canteen*, 27 Cal.2d 802 [167 P.2d 729].)'' (151 Cal.App.2d at pp. 762-763; see also *Lucas* v. *Hesperia Golf & Country Club*, 255 Cal.App.2d 241 249-251 [63 Cal.Rptr. 189]. [Swimming pool maintained by country club].)

Petitioner's argument that his brochures were not designed to bring his charges—or the lack thereof—''to the attention of the public'' is based on the fact that he had addressed himself only to union members and their families. It is perfectly plain, however, that if a practitioner is permitted to subdivide the general public into segments, he could never violate section 3129. He could with just as much plausibility claim that he mailed his advertisements only to persons living within a 25-mile radius from his office or only to prospective patients whose last names began with the letters ''A'' through ''M.'' We think the word ''public'' in section 3000 refers to any and all persons who, at the time an advertisement is addressed to them, have not yet entered into some kind of professional relationship, actual or prospective, with the

licensee. Just being a member of a union which recommends the licensee to its members is obviously not enough.

## VI.

█ Finally petitioner claims not to have violated section 3125 which reads as follows: "It is unlawful to practice optometry under a false or assumed name."

Although an immense amount of literature emanated from his office recommending Union Vision Service and in spite of the large sign maintained on the premises, it is contended that the statute was not violated because on some—by no means all—of the literature distributed, petitioner was identified as the "Professional Director" of Union Vision Service. He says that the name Union Vision Service "was merely a designation of the medical service plan available to the union members." Further, it is claimed that section 3125 merely forbids the practice of optometry under a false or assumed name, not offering to practice under such a name.[17] It is pointed out that whenever a patient came in personal contact with petitioner, signs on the premises disclosed his true name.

We think almost all of petitioner's points are adequately answered in *Garvai* v. *Board of Chiropractic Examiners*, 216 Cal.App.2d 374 [31 Cal.Rptr. 187]. When petitioner argues, on the one hand, that Union Vision Service was merely the name of a service plan available to union members and on the other that the name was merely used to offer the service, he is obviously contradicting himself. The plan, such as it was, surely went further than the mere offer. Anyway, the evidence is ample that petitioner actually practiced under the U.V.S. label. Naturally, when coming into personal contact with a patient he would not introduce himself as Union Vision Service, but that does not alter the fact that patients who entered the building where several doctors practiced optometry would believe that they were about to be examined by a member, associate or employee of an organization called Union Vision Service and that such belief would continue through the actual treatment, even though the individual practitioners had less impersonal names.

The judgment is affirmed.

---

[17]Petitioner points to the definition of "practice of optometry" contained in section 3041 which, indeed, does not include mere offers or holding out. The difference between practicing and offering to do so is recognized in section 3040 which, disjunctively, forbids unlicensed practice or holding out.

Stephens, J., and Aiso, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 17, 1969. Peters, J., Tobriner, J., and Mosk, J., were of the opinion that the petition should be granted.