[L. A. No. 29097. In Bank. June 3, 1968.]

THE PEOPLE ex rel. RICHARD S. L. RODDIS, as Insurance Commissioner, etc., Plaintiff, Cross-defendant and Appellant, v. CALIFORNIA MUTUAL ASSOCIATION et al., Defendants, Cross-complainants and Respondents; SCOTT SCHUBACH, Defendant and Respondent.

Thomas C. Lynch, Attorney General, Arthur C. de Goede, Anthony C. Joseph and Edmond B. Mamer, Deputy Attorneys General, for Plaintiff, Cross-defendant and Appellant.

Marvin D. Donine and Arthur J. Manley for Defendants, Cross-complainants and Respondents and for Defendant and Respondent.

PETERS, J.—The Insurance Commissioner initiated this action to restrain the individual defendants (organized under the name of California Mutual Association) from carrying on business as an insurer without first securing a certificate of authority pursuant to Insurance Code section 700. The Insurance Commissioner has appealed from a judgment denying the injunction and declaring that respondent was not engaged in conducting an insurance business.

California Mutual Association (hereinafter CMA), a non-profit unincorporated association, was organized in 1962. It is controlled by the promoters. The subscribing members have no voting power over the business or the policies of the association. Its stated purpose is to make payments in limited amounts for medical and hospital services rendered to its members using funds derived from periodic dues. The trial court found that the business was carried on honestly and that CMA has made all payments promised under the plan.

Subscribing members were primarily enlisted from labor unions. At the start of the trial CMA had about 1,500 members, the number decreased to 1,063 members by the conclusion of the trial.

At the start of the trial, CMA had contracts with 17 physicians who agreed to render services to the members and to

look exclusively to CMA for payment of the scheduled fee, but they reserved the right to charge the member an amount in excess of the specified fee. It was stipulated that a majority of CMA's members were treated by physicians affiliated with the San Bernardino Foundation for Medical Care and the Riverside Foundation. Although CMA agreed to pay benefits meeting standards set by the foundations, there were no contracts with the individual affiliated doctors, nor was there any arrangement specifying a particular fund for payment.

By the end of the trial, CMA had terminated its contract with the San Bernardino foundation. It had expanded the number of contracts with doctors who agreed to seek payment only from CMA to approximately 38. CMA had about seven physicians who agreed to serve members, but did not restrict themselves as to the source of payment. Although CMA provided for hospital services, no hospital limited itself to any particular fund. CMA encouraged its members to use the services of physicians with whom it had contracts, but, as a matter of practice, it paid the bills of physicians independently chosen by a member in areas where it did not have contracts for medical services. Since the time of trial, we have been informed, further changes have occurred.

The subscribing member paid an annual rate between $10 and $30 depending upon the number of persons covered. The member was also subject to a monthly assessment of $.25 for each $100 of medical expenses which CMA was obligated to pay. The assessment was limited to $10.00, $12.50 or $17.00 per month according to the group to which the member belonged. In return the member received benefits up to $500 for medical and surgical expenses, and up to $1,500 for hospital expenses.

The question presented is whether CMA is an ''insurer'' or a ''health care service plan.'' If CMA is an insurer then it is subject to the supervision of the Insurance Commissioner and it must provide paid-in capital (Ins. Code, § 700.01), and a surplus (Ins. Code, § 700.02) and pay premium taxes. If, as CMA contends, it is a ''health care service plan'' pursuant to the Knox-Mills Plan Act (Gov. Code, §§ 12530-12539), then it is subject to the supervision of the Attorney General and need not meet any statutory financial responsibility requirements.

The Knox-Mills Plan Act as enacted in 1965 requires that a ''health care service plan'' annually register and provide specified information to the Attorney General. (Gov. Code,

§§ 12537, 12538.) Further provisions are made to prevent untrue and misleading statements in advertising and in contracting. (Gov. Code, §§ 12531-12535.) No provisions exist to assure financial responsibility.

The act defines, insofar as is relevant here, a "health care service plan" as any organization "whereby any person undertakes responsibility to provide, arrange for, pay for or *reimburse* any part of the cost of any health care service for a consideration consisting in part of prepaid or periodic charges; but the provisions of this article shall not apply to such a plan operated by an *insurer*. . . ." (Gov. Code, § 12530, subd. (a); italics added.) Although the act expressly excludes "insurers" from its coverage, it does not define that term.

The act itself provides that the legislative background includes the reports by the Assembly Interim Committee on Finance and Insurance. (Stats. 1965, ch. 880, p. 2488.) The committee was formed to investigate possible legislative controls since it was found that "From the standpoint of State regulation, health plans exist in a vacuum." (15 Assembly Interim Committee Report No. 26, Finance and Insurance (1961-1963) p. 28.)

The immunity of health plans to regulation was recognized in 1946 when this court decided the case of *California Physicians' Service* v. *Garrison,* 28 Cal.2d 790 [172 P.2d 4, 167 A.L.R. 306]. The Insurance Commissioner sought to subject CPS to his supervision. This court held that CPS was not an insurer, and, therefore, need not comply with the provisions of the Insurance Code. ■ Insurance necessarily involves the element of indemnity. This was not present in the CPS plan, for there was no promise by CPS "that it will provide medical care; on the contrary, 'the services which are offered to . . . beneficiary members of C.P.S. are offered personally to said members by the professional members of C.P.S. . . .' "[1] (*Id.* at pp. 804-805.) All the risk was borne by the physician. Since the physician agreed to seek payment only from CPS, the member incurred no liability for the services

---

[1] CPS was founded by the California Medical Association as a nonprofit corporation. An alternative ground for holding CPS exempt from the control of the Insurance Commissioner was Civil Code section 593a (now Corp. Code, § 9201) evincing a legislative intent to relieve nonprofit health service corporations from such control. In the present case, CMA is not a corporation, hence, this ground is not available.

rendered. The members would not gain any protection by compelling the acquisition of reserves.

The committee observed that the effect of our decision was that "these direct service pre-paid health plans such as CPS, Blue Shield, or Kaiser were immune from regulations from the Department of Insurance, or for that matter, by any other state, county, or city agency." (15 Assembly Interim Committee Report No. 27, Finance and Insurance (1963-1965) p. 60.) The committee recommended legislation to close this gap to curb abuses of misleading claims, fly-by-night operators, and arbitrary changes in fees.

Although the committee conceded that a health plan is similar to insurance in that it purports to cover a future contingency, it emphasized that the direct service feature was so significant that health plans warranted special treatment.

The committee did not recommend any legislation to assure financial stability of a plan. This is in accord with our statement that a requirement of reserves for a service plan would be "a useless and uneconomic waste."[2] (*California Physicians' Service* v. *Garrison, supra,* 28 Cal.2d at p. 811.)

The act permits a health care service plan to "reimburse" a member and thus indicates that service plans may include some indemnity features, but by excluding an "insurer" from the definition of a "health care service plan" the Legislature has evinced an intention to limit the extent of indemnity features permissible.[3] It is this limit we must now determine.

---

[2] "It becomes the more evident when the purpose and nature of many of the statutory requirements are considered, particularly those relating to the maintenance of reserves or 'guarantee funds' and to the regulation of investments and financial operations. The object ·of these is protection of the insured and thus of the public against the insurer. They assume separateness of identity, with consequent diversity of ownership and possible antagonism of interest between them, as well as definite assumption of liability, legally enforceable, by the insurer to the insured. Such requirements can have meaning, purpose and useful effect only in relation to definite and binding obligations as to which, in their absence, there is danger of default. They are entirely inappropriate where no such risk is assumed, no danger of default can exist, and the control rests ultimately, as here, in the hands of those to whom the very limited obligation runs. Imposition of the requirements in such circumstances would be not only useless, but an economic waste." (*Jordan* v. *Group Health Assn.,* 107 F.2d 239, 250-251.)

[3] Although the committee did not attempt to define the word "insurer," it did state that "since this report does not deal with insurers, Blue Cross' estimated 2,090,000 insureds should be added to the insurance category. . . ." (15 Assembly Interim Committee Report No. 26, Finance

In the *California Physicians' Service* case all the physicians and hospitals agreed to look exclusively to CPS for payment of the scheduled fees. The only indemnity features of the plan were incidental. Although this court was not confronted with a plan involving significant aspects of indemnity,[4] we did state that "Absence or presence of assumption of risk or peril is not the sole test to be applied in determining its status. The question, more broadly, is whether, looking at the plan of operation as a whole, 'service' rather than 'indemnity' is its principal object and purpose." (*California Physicians' Service* v. *Garrison, supra,* 28 Cal.2d at p. 809.)[5]

It has been suggested that it is difficult to determine the principal object and purpose of a plan because this necessarily involves a weighing process. Though true, this in itself is not a sufficient reason for rejecting this test.

■ In determining the nature of a plan, we are cognizant of two policy considerations. Where indemnity features are present, the member bears the risk of personal liability for medical services. This is the insurance risk which can be protected against by financial reserves to assure that the member will receive the benefits for which he has paid. On the other hand, there is a strong social policy to encourage the services which health plans provide the public. In 1946 when the *California Physicians' Service* case was decided, the health plan concept was new to California. Although today there are over

and Insurance (1961-1963) p. 26.) The Blue Cross plan provides services, but on an indemnity basis. (Bureau of Research and Planning, California Medical Association, Financing and Provision of Medical Care in California (1966) pp. 16-22.) Therefore, it seems implicit, by excluding Blue Cross from the proposed coverage of the act, the committee intended to limit allowable indemnity features.

[4]The only other California decision dealing with the status of a plan is *Maloney* v. *American I. M. & H. Assn.,* 119 Cal.App.2d 319 [259 P.2d 503]. The Court of Appeal upheld the appointment of the Insurance Commissioner as conservator for the insolvent A.I.M. A.I.M. had no contracts with doctors or hospitals. A member in need of medical services would ask that the bill be sent to A.I.M. In some cases A.I.M. reimbursed the member directly when he had already paid the bill. The court found that A.I.M. rendered no services other than those of an insurer. The court said, "Viewing the plan of operation as a whole, it clearly appears that its *only* object and purpose was in the nature of an 'indemnity' and not merely the furnishing of a 'service.' " (Italics added; *id.* at p. 326.)

[5]In the present case, the trial court found in accord with this test: "The emphasis by the Association has been upon the rendition of service, the primary objective of its members is identical with the primary objective of the members of all prepaid medical and hospital plans, i.e., to obtain reasonable coverage of medical and hospital bills for a reasonable periodic charge paid in advance."

53 health plans in California,[6] as the committee noted, "care must be taken to always make it possible for new plans to enter the stage, for health is a commodity which has too few purveyors." (15 Assembly Interim Committee Report No. 26, Finance and Insurance (1961-1963) p. 36.)

Any workable test must be a compromise of these two policies. A finding that the principal object and purpose of a plan is direct service merely establishes that the indemnity feature is not dominant, yet, a substantial minority of the members may face liability without the security of financial reserves. We, therefore, conclude that where indemnity is a significant financial proportion of the business, the organization must be classified as an "insurer" for the purposes of the Knox-Mills Plan Act. The principal object and purpose test as enunciated in the *California Physicians' Service* case does not provide for adequate financial security.

We realize that this determination involves balancing the indemnity aspects against the direct service aspects of the business, but only in the context of the plan as a whole can it be determined whether the indemnity feature is so significant as to warrant imposing the Insurance Code financial reserve requirements. Nor, should this requirement unreasonably restrict the development of new health plans or impinge on the growth of existing plans. Health care service plans were given special legislative treatment because of the direct service feature. Only so long as the plans pursue and achieve that objective is the public assured that the protection of the Insurance Code is not necessary.

Although CMA's contracts with the 38 physicians provide for direct service without indemnity, the remainder of the plan is one of insurance. A member is liable for medical services procured from the Riverside foundation, the seven physicians who did not limit themselves to seek payment exclusively from CMA, those physicians who treated members in geographical areas where CMA did not have contracts, and any hospital rendering treatment. However, from the record we cannot determine what proportion of CMA's members is treated by the 38 physicians. At the start of the trial it was stipulated that a majority of the members were treated by physicians affiliated with the San Bernardino and Riverside

[6]Bureau of Research and Planning, California Medical Association, Financing and Provision of Medical Care in California (1966).

foundations. Since then, CMA has terminated its contract with the San Bernardino foundation and contracted with about 11 more physicians. It is not clear to what extent indemnity features are still present.

The judgment is reversed. Upon retrial, the court is directed to determine as of that time in accordance with the views expressed in this opinion the status of CMA as a health care service plan or as an insurer.

Traynor, C. J., McComb, J., Tobriner, J., Burke, J., Sullivan, J., and Wood, J. pro tem.,* concurred.

* Assigned by the Chairman of the Judicial Council.